

**DISTRICT ATTORNEY'S OFFICE**
THREE SOUTH PENN SQUARE
PHILADELPHIA, PENNSYLVANIA 19107-3499
215-686-8000

**Lawrence S. Krasner, Esq.**
**District Attorney**

Direct extension:    215-686-5706
Fax:                         215-686-8725
john.goldsborough@phila.gov

January 12, 2018

Honorable Carol Sandra Moore Wells
Chief United States Magistrate Judge
United States District Court, U.S. Courthouse
601 Market Street, Room 3016
Philadelphia, Pennsylvania 19106-1730

      **Re:    Hill v. Wenerowicz, et al.**
            **<u>Civil Action No. 14-4574</u>**

Dear Chief Magistrate Judge Wells:

      Enclosed please find a copy of our Supplemental Response, as ordered.

              Respectfully submitted,

              /s
              JOHN W. GOLDSBOROUGH
              Assistant District Attorney

/jwg
Enclosure
cc:    Arianna J. Freeman, Assistant Federal Defender

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IVAN HILL** | : | **CIVIL ACTION** |
| **V.** | : | |
| **MIKE WENEROWICZ, et al.** | : | **NO. 14-4574** |

## SUPPLEMENTAL RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS

Per this Court's order, doc. 25, dated May 8, 2017, respondents here address the lack of merit of petitioner's claim.  Respondents' response, doc. 21, dated July 23, 2015, is incorporated here, familiarity with it is assumed, and this is a continuation of it.

Respondents respectfully reiterate their 2015 response's request that the petition for writ of habeas corpus be dismissed without a hearing because it is time-barred and because its alleged "actual" innocence claim makes out no exception to the time-bar.  In light of the evidence at trial and the newly submitted non-record evidence presented by both petitioner and respondents, this contention has no facial merit.  Thus, the petition remains untimely and should be denied as such. Further, if the petition somehow were to be found timely (though it should not be), it should be denied with prejudice and without a hearing, because the claim has no merit.

Since there is no index to the notes of testimony, one is attached as Exhibit A.  It appears the original trial exhibit packet has been lost somehow, which was not uncommon under the former Quarter Sessions office's stewardship, and is unfortunately no longer part of the state-court record sent to this Court.  A partial reconstruction of the trial exhibits from copies in the internal file of this office is attached as Exhibit B, to show more fully the extremely strong evidence of petitioner's guilt that was presented at trial.

In light of the claim of actual innocence, further evidence showing petitioner is in fact

guilty as convicted -- including a partial reconstruction of the pretrial discovery packet from the same source, attached as Exhibit C -- should be considered in full, together with the materials attached to this office's previous response.  <u>See</u> Response, doc. 21, at 23-25.  Finally, for the sake of thoroughness, one volume of notes of testimony (N.T. 12/19/00, voir dire) that was omitted from petitioner's appendix is attached as Exhibit D.

The factual history of this case was set forth in the prior response.  To give a fuller picture, attached as Exhibit E is the petition for allowance of appeal from direct appeal, to which are appended the trial court opinion for appellate review on direct appeal, and the Superior Court opinion, in clearer form than those provided by petitioner in his appendix.  As a further factual supplement, a more detailed and thorough review of the evidence geared to the issues presented today, and in the order presented at the jury trial, follows.


**FACTUAL HISTORY**

The following witnesses testified at trial.

**1.      Rafael Hill, a.k.a. "Poonce"**

Rafael Hill, a.k.a. "Poonce," was the first witness at trial.  He explained that he is the uncle of the two co-defendants, Antonio McKenzie ("Tone") and Ivan Hill ("Skeet"); his sisters are their mothers, and they are first cousins.  On October 27, 1999, at about 9:00 p.m., Poonce had a drawn-out, but not particularly vigorous, fight with his friend, Tyree Turner, at about 13th and Courtland Streets, in front of the store and "gambling house" Tone owned there, about a block from Poonce's house.  Poonce was driving his car, and Tyree walked in front of his car so that Poonce had to slam on his brakes and hit his body on the steering wheel.  They had words, Poonce got out of the car, and they started fighting.  There were many people out, all friends or

acquaintances from the neighborhood, who witnessed their fight, and Poonce claimed Tyree was

in part showing off for the young women present.  After a while, Poonce, who suffers from

seizures, felt one coming on.  At that point, the fighting friends shook hands as friends, Tyree

drove off in his burgundy Oldsmobile Cutlass, and Poonce returned to his mother's house, about

a block away.  Poonce's nephews, the co-defendants, Skeet and Tone, arrived a while later, along

with Tone's girlfriend, Monique Lee, to check on him after they had heard about the fight.

Poonce told them he was fine, and they left, calm and not upset.  He heard gunshots about 15

minutes later, but said that was normal for the neighborhood and thought nothing of it.  He only

heard later about the murder when his own car was ravaged by gunfire, apparently in misguided

revenge.  He later gave a police statement.[1]  N.T. 12/20/00, 73-100.


2.      **Sharon Millsaps**

Ms. Millsaps was a friendly acquaintance of both co-defendants and their uncle, Poonce,

as well as the victim, Tyree Turner, from living on 13th Street near its intersection with Courtland.

She did not witness the fight between Poonce and Tyree earlier that evening, but she had heard

about it.  At about 11:00 p.m., she was outside, at that corner, with some of her friends including

a friend named Rasheed, when she saw Tyree driving down the block on Courtland westbound

toward Broad, alone in his maroon car.  Somebody called out to stop the car – she assumed it

was Rasheed – and Tyree did stop.  Tone was on the opposite corner from her, in front of the

store/gambling house with some men, and when he saw Tyree's car, he went into the store and

yelled, "Yo!"  A couple of seconds later, petitioner came out of the store, and the co-defendants

---

[1] In his police statement, included as part of the pretrial discovery packet, he said he had heard from
Baheejah, Biggie, Sharon, and Monique that they all witnessed petitioner shoot the victim dead.

approached Tyree's car together, Tone leading, with petitioner a couple of steps behind him.  She then heard them talking with Tyree but did not pay attention to exactly what they said as she walked from the corner to the porch of her friend, Baheejah, a few doors from the corner but still overlooking it.  She there joined Baheejah and several other girlfriends.  At that time, she heard a couple of gunshots and ran inside Beheejah's house momentarily with all the other women on the porch.  When she heard a brief lull in the shooting seconds later, however, she came back out, and as she did, she saw petitioner in the street, shooting at Tyree's car from behind, backing up, a nine-millimeter, semi-automatic handgun in his hand.  Tone, meanwhile, was on the sidewalk next to the driver's side window of the car.  She identified both codefendants in the courtroom.  Then both co-defendants ran towards a blue car that was parked on Courtland, facing east, toward Roosevelt Boulevard (Route 1).  Monique Lee, Tone's girlfriend, was in the car; Sharon also knew her.  They pulled off, heading east.  Meanwhile, Tyree's car continued moving west, toward Broad Street.  Ms. Millsaps later gave a police statement, and at trial, she marked police photos showing where she first was on the corner, then where she was on the porch, and where the co-defendants, victim, and cars were.  N.T. 12/20/00, 101-123.

Her police statement, which was consistent with her testimony and included a photographic identification of petitioner as the shooter (although she could not remember petitioner's nickname and called him "Skitch" in it rather than "Skeet"), was admitted as Exhibit DM-1.  Id. at 155.  She testified at the preliminary hearing as well.  Id. at 170-181.


### 3.    Monique Lee

Monique Lee testified that she was the girlfriend of Antonio McKenzie ("Tone") for approximately two years and was also acquainted with petitioner, "Skeet," his cousin; the victim,

Tyree; and their uncle, Rafael Hill ("Poonce").  On October 27, 1999, at about 9:00 or 9:30 p.m.,

she witnessed the fight between Poonce and the victim, in front of many people.  She tried to

stop it, unsuccessfully, and characterized it in her statement as showing off for girls.  It was a

wrestling fight, with no weapons, that occurred after the victim walked by Poonce's car, and it

lasted for about 15 or 20 minutes.  When it ended, Tyree left with some others who had been

present.  Poonce was out of breath, sitting on some steps, and looked sick, as if about to have a

seizure.  He eventually got in his white car and went home.  Then Tone arrived, and she told him

about the fight.  She and Tone then went to pick up petitioner from the Richard Allen projects,

where he lived.  They were going to sell him her red car.  They no longer needed it, since they

had just purchased a new blue car that day.  In the car, speaking about the fight between his uncle

and the victim, Tone said, "They are going to make me fuck them up."  She told this to police in

her statement, Exhibit C-4.  The co-defendants did not seem upset about the fight in the car.

They went to see how their uncle Poonce was, to the house of their grandmother, Poonce's

mother, near 13th and Courtland.  He reported that he was fine.  They then went to the

store/gambling house owned by Tone at 13th and Courtland, as usual, and hung out there,

speaking with friends outside the store.  N.T. 12/21/00, 4-30.

About one and one-half hours after the fight, Tyree, the victim, rode up the block in his

maroon car, and someone called out to tell him to stop – Monique could not tell who.  He

stopped near the store and did not get out of his car but was talking first to somebody else, and

then with the co-defendants, who approached him in the car, for about ten minutes.  She said

Tone was near the driver's side window, on the sidewalk, while petitioner was slightly behind

that, in the street, near the driver's side rear door.  After this, she heard a few gunshots from the

direction of Tyree's car, and people were screaming and running toward her.  She told police in

her statement that except for petitioner and Tone, nobody was near the victim's car when the shooting occurred, and that at the time of the shooting, petitioner was wearing an orange shirt and jeans.  The co-defendants ran toward her, and Tone told her, "Come on," as they ran to their new car.  She had the car keys in her pocket but, as she fished them out, she dropped them, along with her earrings that had been in her pocket, and Tone picked them up and got in the driver's seat.  After standing at the car as though he would get in, petitioner continued to run on foot.  She and Tone took off in their blue car.  In the car, Tone and Monique drove around looking for petitioner, and soon found him at the nearby Walgreens, at Broad and Hunting Park.  N.T. 12/21/00, 30-36, 49-51, 74-78.

Monique testified that she stayed in the car as Tone got out.  She claimed at trial that she was not able to hear precisely the words Tone said to petitioner, but she did remember telling the police detectives in her statement, Exhibit C-4, that she thought she heard him say "I told you not to shoot him."  N.T. 12/21/00, 36-41.  (The statement said that she did in fact hear that, not just that she thought she did.)

Petitioner thus stayed at Walgreens, she testified.  Tone and Monique drove back to the scene of the murder, noticing Tyree's car in the middle of Broad Street as they drove, closed and locked up the store, and retrieved the red car they were to sell to petitioner, parked nearby. Monique got in the red car and Tone in the blue, they drove back to Walgreens, gave petitioner the red car, and then went to stay in a hotel that night and moved to Willow Grove for two months.  Id. at 41-51.

### 4.    Damien Peurifoy, a.k.a. "Biggie"

Mr. Peurifoy, a.k.a. "Biggie," testified that he knew McKenzie ("Tone"), petitioner

("Skeet"), the victim (Tyree Turner), and Rafael Hill {"Poonce"}, and was friendly with all of them. He saw the earlier fight between Poonce and Tyree. He said Tyree had been talking with girls at 13th and Courtland, and Poonce hit Tyree with his car bumper on his leg. They wrestled for approximately 20 minutes, grabbing and pushing, using no weapons. Biggie and Monique tried to break it up; he had grabbed Tyree, and Monique had grabbed Poonce. There was an initial lull in the fight, but it continued. Biggie said the combatants were friends who did not want to fight, and that this was not a serious fight, but that they were showing off. Then Poonce sat down on a step, and Tyree got in his burgundy car and drove off. Neither Skeet nor Tone were present for this. Poonce went home, and Biggie and a friend later went to check on him. Poonce said he had had a seizure, which he was prone to, but was fine. Biggie then went to check on Tyree, who also said he was fine. He then returned to 13th and Courtland, where he saw Tone outside of the store/gambling spot. Biggie then went inside the store in an area where there is a TV and cable box. He did not see Skeet, Tone, or Monique inside, though they may have been present in the other part of the store. While inside, he heard two or three gunshots. He then came to the door, looked out, and saw Skeet standing in the street, with Tone on the sidewalk, and Tyree's car drifting west down Courtland towards Broad Street. He then saw Skeet and Tone run east on Courtland, to a blue car parked across the street from the gambling house. He said both Tone and Skeet got into the car, with Monique already in it. The blue car then pulled away. Biggie went back into the store, closed it up, and turned the lights off. N.T. 12/21/00, 84-101.

Biggie recalled he had given police a statement, Exhibit C-7, that said, among other things, "I saw Tyree's car and I saw Skeet shooting into it." Id. at 102.[2] At trial, he denied

---

[2] The two sentences following that in his statement are worthy of note: "I could see Tyree in the car. After SKEET shot into the car, the car drove down Courtland to Broad St and then down Broad St."

(footnote continued on next page)

7

remembering that he told the police he saw petitioner shooting into the victim's car, but affirmed the accuracy of everything else in his statement, and affirmed that the statement itself said that he had seen petitioner shooting into the victim's car.[3]  He recalled that the detectives had simply asked him to describe what he saw in his own words, and his answer was in lengthy narrative form and was not in response to any leading question.  He recalled their follow-up questions (and his normal answers to these questions) including, "Where was Tone when Skeet was shooting Tyree?" and his answer, "I couldn't see where he was standing.  After the shooting I saw Tone running on the sidewalk with Skeet towards Tone's car." He was also asked "How many people were in the street when Skeet was shooting Tyree?" and answered, "One, I only saw Skeet."  Id. at 104-107, 116-121.

His statement, trial exhibit C-7, also included the following passage repeatedly reiterating that he had witnessed petitioner, whom he knew and identified by name, shoot and kill the victim:

> Q.      Do you recognize this photo?  Shown a black and white photo of Ivan Hill.
> A.      Yes, that is Skeet.  PPN – 720751.
> Q.      Is this the Skeet you stated you saw Shoot and kill Tyree Turner on 10-27-99 at about 11pm at 1300 Courtland St ?
> A.      Yes.
> Q.      What was Skeet wearing when he shot Tyree Turner ?
> A.      I don[']t remember.
> Q.      Describe the gun that Skeet used to shoot and kill Tyree Turner ?
> A.      I didn[']t really see the gun.

Exhibit C-7 (Damien Peurifoy Statement, 11/10/99, 10:30 a.m.) at 3-4.

---

Trial Exhibit C-7 at 2.

[3] The court properly instructed the jury that it was free to find that the statement Damien "Biggie" Peurifoy gave to police, identifying petitioner as the shooter, was more credible than his recantation of only that narrow part of it (N.T. 12/22/00, 116-117).  Clearly, the jury made that implicit credibility finding.

5.      **Roslyn Johnson**

Roslyn Johnson testified that she also knew all the individuals involved, lived in the area, and had witnessed the earlier fight between Tyree and Poonce at 13th and Courtland.  When it stopped, Poonce could hardly breathe, so she took him home, first to his mother's, and then to the hospital, along with Baheejah, a friend.  They drove him to Einstein Hospital.  However, by the time they arrived, he felt better and decided not to go in.  Not only did they take him back home, but he even drove the car back home himself.  Ms. Johnson saw neither co-defendant earlier, but only at the later shooting.  At approximately 11:05 p.m., she was outside, walking home from a friend's house.  She was walking west on Courtland between 12th and 13th when she noticed Tyree's car in the middle of Courtland ahead or further west of her, and noticed a black man, whom she identified as petitioner, standing to the rear of Tyree's car.  Still walking toward him, she watched as he backed up and start running in her direction, east, at the rear of the car, as he shot a handgun back at Tyree's car.  She saw Tone across the street get into his car with Monique, while petitioner ran past her, in the direction of Camac.  She continued west on Courtland and turned north on 13th.  At trial, Ms. Johnson denied seeing petitioner shoot into the car, but her police statement, Exhibit C-8, showed otherwise, and that she had not only identified petitioner by name as the shooter, but also noted (correctly) that he was wearing an orange shirt that night.  Eventually, in court, she identified petitioner as the shooter who was in the street, and Tone as being on the sidewalk next to the driver's side window.  N.T. 12/21/00, 122-148.

6.      **Officer Charles Cassidy, badge #2342[4]**

Officer Cassidy testified that he and his partner, Officer Mahalis, were in uniform in a marked police car at approximately 11:05 p.m. on October 27, 1999.  They encountered a car pointed northbound on Broad Street at Belfield, up against the median, with pedestrians gathered around the car.  The rear window of the car was broken and missing, as was the driver's side door window, and there were bullet holes in the car.  A black male was in the driver's seat, slumped over toward the passenger seat.  The male was alone in the car, bleeding heavily from his side, gurgling, and fighting for breath.  He gave no response when the officers asked him questions.  They got him out of the car, put him into the back of theirs, and took him to Einstein Hospital, nearby, as quickly as possible.  They found no weapons on the male or in the car.  He was pronounced dead at the hospital at 11:23 p.m.  N.T. 12/21/00, 150-157.

7.      **Officer Richard Redanauer, badge #6133**

Officer Redanauer testified that he and his partner, Officer Gerald Poole, in uniform in a marked car, heard a radio call of a report of a shooting, and arrived at the scene of the victim's car, at Broad and Belfield, seconds after the victim had been removed by the other officers and was en route to the hospital.  The car had two bullet holes, one in the trunk, and one in the left rear panel.  A spent projectile was in the driver's seat, and the back window and rear driver's side window were shattered.  They looked for witnesses at that scene, found none, and remained with the car, making sure nobody touched it, until the officers from the Crime Scene Unit / Mobile Crime Detection Unit arrived.  N.T. 12/21/00, 157-163.

---

[4] This is the same Officer Cassidy who, in 2007, was murdered by handgun when he walked into a doughnut shop to check on it due to frequent robberies there in the past.  An armed robbery was occurring at the time.

8.      **Officer William Trenwith, badge #6298**

Officer Trenwith, of the Crime Scene Unit / Mobile Crime Detection Unit, testified regarding the photographs he took of the car and of the scene, the evidence gathered including bullets and fired cartridge casings, and the chain of custody of these items.  N.T. 12/21/00, 164-190.

9.      **Officer Wiliam McKenzie, badge #5999**

Officer McKenzie, of the Firearms Identification Unit, testified that the fired cartridge casings (FCC's) were all fired from the same gun, a nine-millimeter semi-automatic.  The five bullet specimens were deformed enough that they could not be matched clearly to a gun or to the FCC's, and no gun had been submitted; further, it is unusual to be able to match up FCC's and bullets.  However, one of the bullet specimens was definitely a nine-millimeter, and the others were either nine-millimeter or a .38 caliber.  A .38 caliber bullet cannot be shot out of a nine-millimeter gun.  It was likely all the bullets were also nine-millimeter. N.T. 12/21/00, 190-204.

10.     **Francisco Diaz, M.D.**

Dr. Diaz, of the Medical Examiner's office, testified that Tyree Turner, the victim, was pronounced dead at 11:23 p.m. on October 27, 1999, and he performed an autopsy on his body the next day.  Mr. Turner was a 19-year-old African-American male, 5'10", 169 lbs, and his dead body was identified by members of his family.  Mr. Turner had two injuries:  a bullet entrance wound to his left flank, on his left side, and a bullet exit wound in the middle center of his chest, toward the left sternum.  This bullet came from his left side, entering him from behind and to the

side, perforated his stomach and the right ventricle of his heart, and exited through his chest.

There was massive bleeding into his chest cavity.  The hemorrhage from the perforating gunshot

wound caused his death.  The cause of Tyree Turner's death was homicide.  N.T. 12/22/00, 18-31.


Stipulations were then entered regarding the arrest warrants and arrests of petitioner and

his co-defendant, all exhibits were admitted, and the defense rested without presenting evidence.

N.T. 12/22/00, 32-33.

Petitioner was found guilty of first-degree murder and possession of an instrument of

crime.  McKenzie was found not guilty.  Id. at 133-137.  Sentencing occurred immediately at the

request of petitioner and his counsel, given the mandatory nature of the sentence.  Id. at 138-145.


**Trial court opinion findings of fact**

In her trial court opinion for appellate review on direct appeal, which is attached (see

below), Judge Greenspan articulated the following findings of fact, which were endorsed and

block-quoted by the Superior Court:

> On October 27, 1999, at approximately 11:00 p.m., the body of Tyree
> Turner was found in his car on Broad Street in Philadelphia. The victim had been
> shot in the back with a 9 mm luger firearm. Monique Lee testified that [petitioner]
> Ivan Hill, co-defendant Antonio McKenzie and herself were at McKenzie's store
> on 13th and Courtland Streets in Philadelphia. After about ten minutes, the three
> of them moved outside the store and were conversing with a group of friends. Ap-
> proximately fifteen to twenty minutes later the victim, Tyree Turner, was seen
> driving down Courtland Street towards Old York Road when an unknown indi-
> vidual stopped him about a half block away from McKenzie's store. The victim
> remained in his car while speaking with this individual. Monique Lee testified
> that McKenzie and the [petitioner] then walked over to the victim's car and began
> speaking with him. Then minutes later, Ms. Lee heard gunshots. Another witness,
> Ms. Roslyn Johnson, a friend of both the [petitioner] and co-defendant testified
> that as she was walking home up Courtland Street she saw the [petitioner] stand-
> ing in the middle of the street talking to the victim who was still in his car. The
> [petitioner] then began running and shooting at the victim's car. By this time, co-

defendant McKenzie was across the street getting in his car with Monique Lee.
The two of them drove away and tried to find the [petitioner] who had fled on foot.
They found the [petitioner] at a Walgreen's Drug Store where the [petitioner] and
co-defendant McKenzie had a conversation and then separated once again.

Officer Cassidy was one of the first to arrive on the scene. Upon arrival,
the officer saw a vehicle that had a broken window on the rear driver's side, the
entire rear window was shattered and there were several bullet holes in the vehicle.
The officer then went to the front of the car and found the victim lying uncon-
scious on the driver's seat. The cause of death was multiple gunshot wounds.

Trial Court Opinion, March 27, 2001, at 1-3, quoted in Superior Court opinion, January 29, 2002,

at 1-2.[5]  A copy of the trial court's opinion on direct appeal is appended to Exhibit F, attached,

described below.


**PCRA court opinion findings of fact**

In her PCRA opinion dated January 23, 2004 (Appendix at 213-215), Judge Greenspan

referred to the additional identification evidence of Ms. Millsaps, though not to that of Mr.

Peurifoy:

The facts essentially are that on October 27, 1999, [petitioner] and his co-
defendant, Antonio McKenzie, confronted Tyree Turner while he was in his car
about a fight he had had earlier that evening with their uncle.  [Petitioner] then
fired shots at the car, killing Mr. Turner.  He and McKenzie then fled with a friend
and eyewitness, Monique Lee.  At trial [petitioner] was identified not only by Ms.
Lee, but also by two other women at the scene, both of whom knew [petitioner] as
"Skeet".

PCRA court opinion at 1-2.


**PROCEDURAL HISTORY**

Before trial, the court heard argument and denied the motion in limine of petitioner's

---

[5] In addition to this evidence, there was also strong corroborating eyewitness identification testimo-
ny from Sharon Millsaps and Damien Peurifoy.

attorney, Jules Epstein, Esquire, to bar expected testimony by Monique Lee that, right after the

murder, when she and McKenzie ("Tone") met up with Hill ("Skeet") at the Walgreens on Broad

Street, she thought she heard Tone say to petitioner, "I told you not to shoot him!"  McKenzie's

attorney, Scott DiClaudio, made a concurrent motion to keep the testimony in, and to sever if the

court were to bar its use.  The Commonwealth argued the evidence was admissible to show

McKenzie's continuing participation in the conspiracy under the Pennsylvania co-conspirator

exception to the hearsay rule; the fact that the statement was spontaneous and against

McKenzie's penal interest (his admission to discussing the use of a gun to threaten the victim,

Tyree Turner, before it was used) showed that it met the Confrontation Clause boundaries

applicable at the time.  She was clear that the statement should not be used against petitioner,

including his silence in reply, and she requested a cautionary instruction by the court to that

effect.  The court generally agreed, but, in the face of petitioner's trial counsel's contention that if

there was any conspiracy, it had ended by then, the court queried whether there was case law to

support the view that the statement was "in furtherance of" the conspiracy, as required by state

law to support the co-conspirator hearsay exception, during flight from the scene after the murder.

The court asked for case law, and after it was provided, admitted the statement as to McKenzie

only, but not to petitioner, asking both sides to craft a cautionary instruction for her to give to the

jury.  N.T. 12/20/00, 28-34, 45-50.

Following opening jury instructions, N.T. 12/20/00 at 35-45, and opening arguments for

both co-defendants and the prosecutor, id. at 55-73, the presentation of evidence at trial

commenced.

Mr. Epstein filed post-sentence motions on December 26, 2000, along with a

simultaneous motion to withdraw.  A copy of both is attached as Exhibit E.  The court denied the

post-sentence motions on February 7, 2001.  Newly appointed counsel, Earl G. Kauffman,

Esquire, filed a timely notice of appeal.

In his statement of matters complained of on appeal to the trial court, petitioner claimed

that (1) the evidence had been insufficient to convict, and (2) that trial counsel had been

ineffective for failing to file a pretrial motion to sever the co-defendants' trials due to Monique

Lee's anticipated testimony, per her police statement, that McKenzie had told petitioner, "I told

you not to shoot him."  The trial court explained why these claims lacked merit in its opinion for

appellate review.  (A copy of the trial court's opinion on direct appeal is appended to Exhibit F,

attached, described below.)

In petitioner's brief on appeal to the Superior Court, he claimed that (1) the statement "I

told you not to shoot him" warranted severance, and (2) trial counsel was ineffective for failing

to move to sever, given that statement. Petitioner's Appendix at 182.

On January 29, 2002, the Superior Court of Pennsylvania affirmed petitioner's judgment

of sentence in an unpublished memorandum decision.  See Commonwealth v. Ivan Hill, No. 797

A.2d 372 (Pa. Super. 2002) (table).  (A copy of its opinion is also appended to Exhibit F).

A copy of petitioner's petition for allowance of appeal to the Pennsylvania Supreme

Court on direct appeal is attached as Exhibit F.  He brought the same two claims there.

Appended to the allocatur petition are copies of the trial court's opinion for appellate review

dated March 27, 2001, and of the Superior Court's opinion on direct appeal dated January 29,

2002.  On August 20, 2002, the Pennsylvania Supreme Court declined review.  See

Commonwealth v. Ivan Hill, 806 A.2d 859 (table) (Pa. 2002).

Petitioner then filed a timely petition for relief under Pennsylvania's Post Conviction Re-

lief Act, 42 Pa.C.S. § 9541 et seq. (PCRA), postmarked February 28, 2003, and docketed on

March 5, 2003.  Daniel Rendine, Esquire, was appointed counsel and filed an amended PCRA

petition on September 11, 2003.  A copy is included in petitioner's Appendix at 202.  In it, peti-

tioner claimed that:  (1) the trial court had deprived him of a fair trial when it failed to instruct

the jury that the identification testimony of Sharon Millsaps and Roslyn Johnson should be re-

ceived with caution, i.e., failed to give a charge under Commonwealth v. Kloiber, 106 A.2d 820

(Pa. 1954); (2)(a) trial counsel had been ineffective for failing to request a Kloiber charge regarding

that evidence; (2)(b) direct appeal counsel was ineffective for failing to include in his brief a claim

accusing trial counsel of ineffectiveness for failing to request a Kloiber charge regarding that evi-

dence; (3) trial counsel was ineffective for failing to conduct a proper pretrial investigation and for

failing to call allegedly available witnesses to refute the trial testimony and police statements of the

many Commonwealth witnesses identifying petitioner as the shooter; (4) trial counsel was ineffec-

tive for failing to call (a) witness Kyra Hayes, who indicated she saw a tall black male getting out of

the victim's car on Broad Street and disappear before police got to the victim's car, (b) Police Office

Craig Thomas to testify to the hearsay that he interviewed a black male at the scene ("John Doe")

who indicated that Poonce shot the victim, and (c) an unknown female ("Jane Doe"), to testify that

she saw Poonce with a gun the day of the shooting; (5)(a) the trial court erred when it failed to in-

struct the jury on voluntary manslaughter given the facts in evidence; (5)(b) trial counsel was inef-

fective for failing to request a voluntary manslaughter charge for his client, who was seen by multi-

ple witnesses shooting the victim dead; and (5)(c) appellate counsel was ineffective for failing to

include in his appellate brief a claim accusing trial counsel of ineffective assistance for failing to

request a voluntary manslaughter jury instruction under these facts.  Appendix at 204-206, 207-212.

Thus, in contrast to his bevy of new materials presented today, along with the one notarized

statement he later presented to the state courts, petitioner was at the time of his PCRA proceedings

attempting to blame the murder on Poonce. Today, he is trying to pin the killing on Tone, who is himself dead.

After notifying petitioner of its intent to dismiss without a hearing, the PCRA court (still Judge Greenspan) denied the PCRA petition, finding the claims lacked merit, as it explained in an opinion and order dated January 23, 2004. Appendix at 213-215. Specifically as to the allegedly missing but unnamed witnesses, the judge found that, in contravention of a well-settled requirement of state law, petitioner had attached no affidavits or notarized statements from any of the individuals he was alleging should have been called by his ineffective trial counsel, to demonstrate: that they actually exist and were available at trial; that counsel knew or should have known of them; that they actually would have testified for petitioner at trial; and that the absence of their testimony caused Strickland prejudice, i.e., had they testified, there would have been a reasonable probability of a different verdict. PCRA court opinion, January 23, 2004, Appendix at 214-215.

Petitioner did not appeal.

Instead, over a year later, petitioner filed a second and untimely PCRA petition postmarked January 29, 2005, and received by the PCRA Unit of the Court of Common Pleas on February 2, 2005. Appendix at 216. Attached to his untimely petition was a notarized statement dated September 1, 2004, from his acquitted non-testifying co-defendant, McKenzie. Appendix at 220. Petitioner claimed, with no support, that the notarized statement had earlier been sent directly to the Court of Common Pleas. Appendix at 218, ¶5(B).[6]

---

[6] There is absolutely no support for this in the state-court record or the files of the Commonwealth. Furthermore, it is notable that what petitioner today, in federal court, presents together with this notarized statement – an undated handwritten letter – was never presented to the state courts. It was not part of petitioner's 2005 PCRA petition. It is completely new in federal habeas.

In that ambiguous notarized statement, McKenzie alleged that he himself was "absolutely guilty" of an unspecified murder of an unnamed victim on an unstated date, and that "another individual has been *charged* with this murder" who was "an innocent person" of unspecified gender -- and gave no further details.[7]  (Emphasis added.)  This contradicted the uniform testimony of all witnesses at trial, and all their police statements, to the effect that McKenzie, who did not have a gun, was standing in a position that would not have matched the bullet entry and exit wounds on the murdered victim's corpse, while petitioner did have a nine-millimeter gun, which matched the caliber of the bullets and fired cartridge casings in evidence, and was shooting it while in exactly the position that would have produced the one entry and exit wound in the victim's corpse, i.e., by the driver's side rear door and/or driver's side rear car tire/fender, at the rear of the car.[8]

Petitioner invoked the statutory PCRA time-bar exception that the McKenzie affidavit "would have changed the outcome of the trial if it had been introduced."  Appendix at 217. (Given the overwhelming factual evidence at trial that petitioner was the shooter, not his long-acquitted first cousin and co-defendant, that assertion was simply false.)  Petitioner claimed his mother received the affidavit on January 5, 2005, and that he himself became aware of it that

---

[7] These individuals were drug dealers.  It is not inconceivable – it is even likely – that the ambiguous notarized statement, if true, concerned *a different murder entirely*.  McKenzie's choice of language – stating that the other "person" had been "charged" – is also odd.  By the time of the notarized statement, petitioner had not just been "charged" but had been convicted and sentenced, and had finished his direct appeal and first and timely PCRA litigation.  The ambiguity will never be cleared up, since McKenzie is apparently dead.  But it is noted, since it -- along with his record of crimen falsi -- detracts strongly from the credibility of the notarized statement.

[8] Court records reflect that McKenzie was convicted of multiple crimes through his life under various names, and even used his cousin Hill's last name as one of his aliases.  He was convicted on February 23, 1993 under the name Anthony Hill of various *crimen falsi* -- crimes of dishonesty or false statement -- including theft.  See Doc. 21, Exhibit B.  These, of course, bear upon the facial trustworthiness of his risk-free, post-acquittal statement taking the rap for his first cousin.

same day.  However, he did not provide any details, or explain the delay of over three months

between the date of the affidavit and the date on which he and his mother had allegedly simulta-

neously received it.  Appendix at 218.  Nor did he explain why (assuming the truth of the affida-

vit) he should not be presumed to have himself been aware of the alleged information in it much

earlier.

On April 7, 2005, the PCRA court – also Judge Greenspan – issued a notice of intent to

dismiss without a hearing per Pennsylvania Rule of Criminal Procedure 907.  Appendix at 226.

In that notice, the court cited 42 Pa.C.S. § 9545(b) and Commonwealth v. Abu-Jamal, 833 A.2d

719, 733-35 (Pa. 2003) (under PCRA time-bar exception for newly discovered evidence, §

9545(b)(1)(ii), submission is due 60 days from the date on which the newly discovered and pre-

viously unknown evidence could have been discovered with reasonable diligence; since Abu-

Jamal should have been aware of this evidence well before he submitted it, petition was properly

dismissed as untimely).  The PCRA court also found that the McKenzie affidavit did not consti-

tute "new evidence."  Appendix at 226.[9]

Petitioner did not file a response to that notice of intent to dismiss.  Accordingly, on May

12, 2005, the PCRA court dismissed the petition as time-barred.  A copy of the dismissal order

was attached as Exhibit A to the Commonwealth's 2015 habeas response, Doc. 21.  Petitioner did

not appeal.

---

[9] That is, if true, this information -- the allegation that petitioner was not the shooter and McKenzie
was -- would have been *known* to petitioner at the time of trial, not hidden in any way, and is thus
not considered "new" under well-settled state law.  The court's pinpoint cite to Abu-Jamal made
plain its finding that the affidavit and PCRA petition did not sufficiently show that it had been sub-
mitted within 60 days after the date petitioner ***could have discovered*** the substance of the affidavit
with reasonable diligence, as required.  Had petitioner wished to contest these findings, he should
have responded to the notice of intent to dismiss, and, if unsuccessful, then appealed – in 2005,
when McKenzie was still actually alive.

Petitioner then filed ***nothing*** in state or federal court regarding this case for over ***nine years***.  During those many years while petitioner was filing nothing in this case, according to petitioner's "new" 2015 affiants – see Appendix at 231 ¶8 and at 234 ¶5 –McKenzie was murdered, in 2008.  Indeed, widely available public listings of homicide victims for that year show one Antonio McKenzie was a Philadelphia murder victim on February 29, 2008.

On July 21, 2014, petitioner signed his time-barred federal habeas petition, filed pro se July 31, 2014 (ECF No. 1), acknowledging its untimeliness.  In this petition, petitioner ostensibly brought five claims:  (1) the admission at this joint trial of the testimony of Monique Lee, stating that she had heard the non-testifying co-defendant say to petitioner right after the murder, "I told you not to shoot him," violated his Sixth Amendment right to confront his accuser; (2) that same testimony required severance; (3) trial counsel was ineffective for failing to request suppression of the eyewitness statements allegedly based on a single photo being shown to them; (4) the state courts erred in finding his second PCRA petition based on McKenzie's statement untimely; and (5) the court erred in its opening and closing instructions to the jury on not judging the guilt of petitioner's co-defendant regarding possession of an instrument of crime, ground 5.  Doc. 1, grounds 1-5.

Petitioner attached to his 2014 federal habeas petition a copy of the same 2004 statement of McKenzie that he had previously presented to the state PCRA court in his second (2005) and time-barred PCRA petition, Appendix 216-225.  The 2004 statement represents without specification that Tone wanted to speak confidentially with a state trooper to confess that he, a drug dealer, was guilty of killing an unnamed young man on an unnamed date, and that as of 2004 -- years after petitioner had already been convicted and sentenced for the murder of Tyree Turner, and years after McKenzie had been acquitted -- another person had been "charged with

this murder".  Doc 1, ECF p. 37.  There is no further information regarding whether Tone's request for a confidential meeting was ever granted, or to whom he presented this notarized statement. Doc 1, ECF pp. 37.

Petitioner also included something with his 2014 federal petition that he had not previously filed in state court:  an undated handwritten note allegedly from McKenzie, signed "Tone" and addressed to "Skeet," i.e., petitioner.  Doc 1, ECP pp. 38-39.  Though undated, the handwritten letter was very likely written after Tone's full acquittal; the writer stated that he was "sorry for shooting that boy[,] killing him[,] and letting you take the rap."  Doc. 1, ECF pp. 38-39.

In his pro se 2014 petition, acknowledging its untimeliness, petitioner stated that he believed the state courts' decisions violated federal law and that this somehow established his right to an exception to the statute of limitations; that the factual predicate of his fourth federal habeas claim, the 2004 affidavit that he had presented to the PCRA court in 2005, somehow could not have been discovered with due diligence before he filed his 2014 federal habeas petition; and that he believed he was following the prescribed deadlines by presenting that "newly discovered" 2004 affidavit within one year of its discovery, even though the habeas petition was dated ten years after the 2004 affidavit, and even though he had presented that affidavit (though not the letter) to the state courts in 2005.  Doc. 1 at form pages 17-18, ¶17 ("Timeliness of Petition").

Although there is no right to counsel in federal habeas proceedings, in August of 2014, petitioner moved for the appointment of counsel, presenting a letter from the Federal Defender's non-capital habeas unit agreeing to represent him if they were appointed (ECF No. 2) -- but mak-

ing no other showing of the required standard for the appointment of counsel in habeas, i.e., that the interests of justice required it.[10]

Respondents were ordered to respond to the petition, though not the motion for appointment of counsel, only after that, in September of 2014, ECF No. 6.  As usual, they were not added to the ECF docket as email-connected counsel of record, and were not served via ECF emails, until after their first extension was filed, on October 10, 2014.  In an unusual aspect of this case, however, they were not timely served via U.S. Mail with the petition, nor with the counsel motion to which they were expected to respond -- although both should ordinarily have been sent to them by the Clerk's Office along with the order for them to answer (since that is the only method of service afforded respondents of anything filed before they start receiving ECF emails, after their first extension request).  They first received the counsel motion, upon undersigned's request, on November 21, 2014, after it had been granted, when Ms. Bentley in the chambers of the Honorable Petrese B. Tucker faxed it to respondents.  Judge Tucker had already granted it on November 20, 2014 (which is what prompted the inquiry of undersigned counsel).  ECF No. 10.

Thus, the appointment of counsel proceeding was effectively ex parte.

Petitioner's newly-appointed counsel filed a memorandum of law in support of the habeas petition, and an appendix, with additional and newly-produced "innocence" affidavits plus an undated letter allegedly from McKenzie to petitioner in prison.  Docs. 20, 20-1.  Therein, counsel withdraws petitioner's grounds 3 and 5 from his pro se habeas petition.  He reasserts his ground 4 as a "gateway actual innocence claim", and combines his previous grounds 1 and 2 into one

---

[10]  The standard for such appointment in habeas is whether the interests of justice so require, per 18 U.S.C. § 3006A(a)(2)(B).  Appointment of counsel in habeas, to which there is no right, should generally occur only on those rare occasions when the issues are complex or a hearing is required. Reese v. Fulcomer, 946 F.2d 247, 263-64 (3d Cir. 1991).  In this instance, the time-bar issue is not complex, and there is no need for a hearing.

substantive claim, which counsel describes as a "<u>Bruton</u>-based ineffective assistance of counsel claim." Memo (doc. 20) at 14. <u>See</u> memo at 24 n.8. Thus, his present petition contains one substantive claim.

On July 23, 2015, respondents filed an answer requesting that the petition be denied as time-barred, with prejudice, and without a hearing, but reserving argument on petitioner's claim(s) and any procedural defenses, seeking an opportunity to file a supplemental response if the Court were to find that helpful. Doc. 21.[11] Petitioner filed a reply through counsel on October 2, 2015. Doc. 24. On May 8, 2017, this Court ordered respondents to file a supplemental response to the claims on the merits. Doc. 25. This is that response.

The petition remains time-barred, because petitioner has not shown that he is actually innocent. But even if somehow it were not time-barred, no relief is due. Petitioner's claims lack merit.

## <u>STANDARD OF REVIEW</u>

"Federal habeas review of state convictions frustrates both the States' sovereign power to

---

[11] To refute petitioner's assertions of "actual" innocence, among other things, respondents attached as Exhibit C to that time-bar response the police eyewitness statement of Baheejah Johnson, yet another eyewitness to the shooting who knew everyone involved and named them. This statement is also part of the re-created discovery packet attached today as Exhibit C. In that statement, Ms. Johnson told police that she witnessed the shooting death of Tyree Turner on October 27, 1999. Asked to describe what happened in her own words, she said that after being called from inside the gambling house by "Tony" when Tyree pulled his car up at the location, "Dog" shot into the car, then explained that "Dog" was a term that was used to refer to anyone. She then named the shooter as "Skeet" (petitioner's nickname) and identified him as petitioner from a photo. She said that while shooting into Tyree's car with his black gun, he wore an orange tee shirt and black jeans, and that he must have shot his gun about five times. Statement, Baheejah Johnson, 11/4/99, 1:10 a.m., Exhibit C to prior response, and part of Exhibit C to this response. That fully corroborates the other incriminating evidence and eyewitness testimony, showing that, contrary to petitioner's contention, he is not actually innocent.

punish offenders and their good-faith attempts to honor constitutional rights." <u>Harrington v.</u>

<u>Richter</u>, 562 U.S. 86, 103 (2011) (quoting <u>Calderon v. Thompson</u>, 523 U.S. 538, 555-556 (1998)).

"It disturbs the State's significant interest in repose for concluded litigation, denies society the

right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched

by few exercises of federal judicial authority." <u>Richter</u>, 562 U.S. at 103 (quotation marks and

citation omitted).  "In light of the profound societal costs that attend the exercise of habeas

jurisdiction, [there are] significant limits on the discretion of federal courts to grant habeas

relief." <u>Calderon</u>, 523 U.S. at 554-555 (quotation marks and citation omitted).

Those limits were strengthened by Congress in 1996 in significant changes to the federal

habeas statute, now also known as AEDPA after the legislative title of those reforms.[12]  "AEDPA

greatly circumscribes a federal habeas court's review of a state court decision," <u>Johnson v.</u>

<u>Carroll</u>, 369 F.3d 253, 257 (3d Cir. 2004), and is "designed to confirm that state courts are the

principal forum for asserting constitutional challenges to state convictions." <u>Richter</u>, 562 U.S. at

103.

Under AEDPA, if a federal constitutional claim was "adjudicated on the merits" by the

state courts, a federal habeas court may not grant relief unless the adjudication of the federal

claim by the state courts:

> (1) resulted in a decision that was contrary to, or involved an unreasonable appli-
> cation of, clearly established Federal law, as determined by the Supreme Court of
> the United States, or

> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

---

[12] The Anti-Terrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214
(1996), amending, <u>inter alia</u>, the federal habeas statute at 28 U.S.C. §§ 2241 <u>et seq.</u>, effective April
24, 1996 ("AEDPA").

28 U.S.C. § 2254(d).[13]

Federal review under section 2254(d)(1) must be made in light of the record that was before the state court.  Cullen v. Pinholster, 563 U.S. 170, 181-182 (2011).  A state court's factual determinations are presumed correct, and the burden of rebuttal is on petitioner, by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  Further:

> Under the exhaustion requirement, a habeas petitioner challenging a state convic-
> tion must first attempt to present his claim in state court.  28 U.S.C. § 2254(b).  If
> the state court rejects the claim on procedural grounds, the claim is barred in fed-
> eral court unless one of the exceptions to the doctrine of Wainright v. Sykes, 433
> U.S. 72, 82-84 (1977), applies.  And if the state court denies the claim on the mer-
> its, the claim is barred in federal court unless one of the exceptions to § 2254(d)
> set out in §§ 2254(d)(1) and (2) applies.  Section 2254(d) thus complements the
> exhaustion requirement and the doctrine of procedural bar to ensure that state pro-
> ceedings are the central process, not just a preliminary step for a later federal ha-
> beas proceeding, see id., at 90.

Richter, 562 U.S. at 103.

To properly apply the standard, a federal habeas court must "determine what arguments or theories supported or… *could have supported*, the state court's decision; and then… ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the *holding* in a prior decision of [the Supreme Court]."  Richter, 562 U.S. at 102 (emphasis added). See also Pinholster, 563 U.S. at 188 (same) (quoting Richter).

The AEDPA intentionally created a standard that was "difficult to meet."  Metrish v. Lancaster, 569 U.S. 351, 358 (2013) (citation omitted).  Its purpose was to restrict habeas review so that it would function as "a 'guard against extreme malfunctions in the state criminal justice systems,' and not as a means of error correction."  Greene v. Fisher, 565 U.S. 34, 38 (2011),

---

[13] "[C]learly established Federal law" does not include state law.  Claims arising under state law provide no basis for federal habeas review or relief, i.e., they are not cognizable.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Pulley v. Harris, 465 U.S. 37, 41 (1984); Riley v. Harris, 277 F.3d 261, 310 n.8 (3d Cir. 2001).

quoting Richter, 562 U.S. at 102. "Even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Richter, 562 U.S. at 102, citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

Under this deferential standard, when examining the state-court disposition of a claim, a federal habeas court "must first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Andrade, 538 U.S. at 71. See also Yarborough v. Alvarado, 541 U.S. 652, 660-61 (2004). "That statutory phrase refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). See also Johnson v. Carroll, 369 F.3d 253 (3d Cir. 2004). "[A] lower court may not consul[t] its own precedents, rather than those of this Court, in assessing a habeas claim governed by § 2254." White v. Woodall, 134 S.Ct. 1697, 1702 n.2 (2014) (citation and quotation marks omitted). Unless the habeas court can identify a "specific legal rule" that was "squarely established" through Supreme Court precedent at the time the state court rendered its decision, it cannot be said that the decision of the state court is contrary or an objectively unreasonable application of such precedent, and the petitioner's claim must be rejected. Knowles v. Mirzayance, 556 U.S. 111, 122 (2009) (noting numerous opinions of the Supreme Court that have made this requirement clear).

Once the applicable "clearly established federal law" is determined, petitioner must establish that the state court decision is either contrary to, or an unreasonable application of, that precedent. It is rare for a habeas petitioner to demonstrate that the "contrary to" test is met;[14]

---

[14] Regarding the "contrary to" prong, the U.S. Supreme Court has stated:

> A state-court decision is "contrary to" our clearly established precedents if it "ap-

(footnote continued on next page)

most cases focus on "unreasonable application."

"Unreasonable application" means correct identification of the governing U.S. Supreme Court legal rule (although it need not be identified by citation or name by the state court), followed by an ***objectively*** unreasonable – not just an incorrect – application of the rule to the case's facts.  See, e.g., Woodford v. Visciotti, 537 U.S. 19, 25-26 (2002) (per curiam).

> When assessing whether a state court's application of federal law is unreasonable, "the range of reasonable judgment can depend in part on the nature of the relevant rule" that the state court must apply.  Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  Because AEDPA authorizes federal courts to grant relief only when state courts act unreasonably, it follows that "[t]he more general the rule" at issue -- and thus the greater the potential for reasoned disagreement among fair-minded judges -- "the more leeway [state] courts have in reaching outcomes in case-by-case determinations." Ibid.; see also Knowles v. Mirzayance, 556 U.S. 111 (2009).

Renico v. Lett, 559 U.S. 766, 776 (2010).

The question under the statute is thus not whether the state court's decision was right or wrong, but whether it was reasonable.  Lett.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  Williams, 529 U.S. at 411.  Even if a federal court finds error, if "it is at least reasonable to conclude that there was not, [that] means that the state court's determination to that effect must stand." Packer, 537 U.S.

---

> plies a rule that contradicts the governing law set forth in our cases" or if it "con-fronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." Avoiding these pitfalls does not require citation of our cases -- indeed, it does not even re-quire awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.

Early v. Packer, 537 U.S. 3, 8 (2002) (citations omitted) (emphasis added).  See also Price v. Vin-cent, 538 U.S. 634, 640 (2003); Bell v. Cone, 535 U.S. 685, 694 (2002).  The Court has been careful to note that most cases will not fit into this narrow category, which is limited to direct and unequiv-ocal contradiction of then-extant Supreme Court authority.  Williams, 529 U.S. at 405-407.

at 11. "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Richter, 562 U.S. at 103.

"Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* this Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error." White v. Woodall, supra, 134 S.Ct. at 1706 (emphasis original). "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from this Court is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003) (per curiam).

The Supreme Court has repeatedly reversed habeas courts that substitute their own judgment for that of the state court and fail to determine whether the state court's interpretation was reasonable, even if erroneous. See, e.g., White v. Woodall, supra; Parker v. Matthews, 567 U.S. 37 (2012) (per curiam); Coleman v. Johnson, 566 U.S. 650 (2012); Richter, supra; Premo v. Moore, 562 U.S. 115 (2011); Visciotti, supra. Even if it were to agree with such independent judgment that there was error, if "it is at least reasonable to conclude that there was not, [that] means that the state court's determination to that effect must stand." Packer, 537 U.S. at 11.

"[T]he only question that matters under § 2254(d)(1) [is] whether a state court decision is contrary to, or involved an unreasonable application of, clearly established federal law." Lockyer v. Andrade, 538 U.S. 538 U.S. 63, 71-72 (2003) (emphasis added). When rendering a decision under the habeas statute, a "readiness to attribute error" is:

> inconsistent with the presumption that state courts know and follow the law. It is also incompatible with § 2254(d)'s "highly deferential standard for evaluating state-court rulings," which demands that state court decisions be given the benefit of the doubt.

Visciotti, 537 U.S. at 24 (citations omitted).

The habeas statute is, in sum, a modified res judicata rule that "preserves [federal-court] authority to issue the writ in cases where there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther."  Richter, 562 U.S. at 102.

If the standard of the AEDPA is met, that is still not itself reason for relief.  For a petitioner to qualify for habeas relief, he must then demonstrate, under the statute, that "he is in custody in violation of the Constitution of laws or treaties of the United States" – that is, that the claim has merit under the de novo standard of review of 28 U.S.C. § 2254(a), to which current constitutional law applies, not the law in effect at the time of the state court decision (as under § 2254(d)).  See Pinholster, 563 U.S. at 181; Panetti v. Quarterman, 551 U.S. 930, 953 (2007) ("When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied.  A federal court must then resolve the claim without the deference AEDPA otherwise requires").

There is a final and additional requirement for habeas relief:  the alleged violation must have had a "substantial and injurious effect" on the outcome of the trial.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  See also Davis v. Ayala, 135 S.Ct. 2187 (2015); Fry v. Pliler, 551 U.S. 112, 121 (2007) ("We hold that in [Section] 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht, supra, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in Chapman [v. California], 386 U.S. 18 [(1967)].").  As applied to each claim below, given the overwhelming strength of the evidence, even if any claim had merit, any alleged error

would fall short of the Brecht prejudice standard: "whether the … error 'had substantial and injurious effect or influence in determining the jury's verdict.' Kotteakos v. United States, 328 U.S. 750, 776 (1946)."  Brecht v. Abrahamson, 507 U.S. at 623.  There was no such effect or influence here.


## DISCUSSION

**4.      Petitioner is not actually innocent, and his unpersuasive claim that he is does not overcome the time-bar.**

The 2005 PCRA court did not err in finding that the notarized statement of petitioner's acquitted first-cousin and co-defendant, who had been convicted of crimen falsi offenses, did not qualify as newly discovered evidence of actual innocence, both given the strength of the evidence of guilt at trial, and given the fact that this statement, even assuming its truth, would not have been information newly known to petitioner, but rather known fully from the start.  See Appendix at 226 (notice of intent to dismiss, April 7, 2005); 42 Pa.C.S. § 9545(b); Commonwealth v. Abu-Jamal, 833 A.2d 719, 733-35 (Pa. 2003) (under PCRA time-bar exception for newly discovered evidence, § 9545(b)(1)(ii), submission is due 60 days from date newly discovered evidence could have been discovered with reasonable diligence; since Abu-Jamal should have been aware of this evidence well before, petition was properly dismissed as untimely).  Its dismissal of that PCRA petition on May 12, 2005, as time-barred, was correct. See 2015 Response (doc. 21) at Exhibit A.

The applicable subsections under 42 Pa.C.S. § 9545(b), cited by the PCRA court, require a showing that "(ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence" and that the petition invoking that exception "shall be filed within 60 days of the date the claim could have been

presented" (emphasis added).  The PCRA court's citation to Abu-Jamal made plain that it was

finding a lack of due diligence and non-compliance with the 60-day requirement.  By specifically

adding that this was not "new evidence," the PCRA court found that the substance of the

affidavit, if true, would have been known to petitioner at the time of the crime, so the affidavit

was late.

That ruling under state law cannot be revisited in federal habeas. 28 U.S.C. § 2254(a);

Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  In any case, it was correct under state law. See

Commonwealth v. Padillas, 997 A.2d 356, 364 (Pa. Super. 2010) (agreeing with federal approach;

"a defendant has a duty to bring forth any relevant evidence in his behalf").  See doc. 21 at 17

n.10.

The new materials – the undated letter that dovetails with the notarized statement,

allegedly from the same dead and acquitted first-cousin codefendant, plus the 2015 federally-

funded-counsel-produced new statements – were never presented to the state courts.  But, as

explained in the prior response (doc. 21), they are not worthy of belief, even facially.  They

simply do not overcome the trial evidence, which was overwhelming.  Petitioner does not meet

the narrow and truly rare circumstances necessary to pass through the "gateway" of McQuiggin v.

Perkins, 133 S.Ct. 1924 (2013).  See discussion in prior response (doc. 21).  This petition is time-

barred.


**1&2.  The state courts acted reasonably and correctly in finding trial counsel not ineffec-
tive for not moving to sever based on the anticipated admission of the testimony of
Monique Lee about Antonio McKenzie's inculpatory non-testimonial statement at
the co-defendant's joint trial that "I told you not to shoot him."**

Petitioner claims counsel was ineffective under Strickland v. Washington, 466 U.S. 668

(1984), for failing to raise a Confrontation Clause objection, per Bruton v. United States, 391 U.S.

123 (1968), to the "I told you not to shoot him" co-conspirator statement relayed through Monique Lee's testimony, and/or for failing to move to sever pretrial. Memorandum at 24-32. Since the state courts acted reasonably in denying this claim, and were correct, habeas relief must be denied.

This is actually a combination of claims, one of which is exhausted and deserving of full AEDPA deference, and the other of which is defaulted and lacking in merit such that, under Supreme Court jurisprudence, the default cannot be excused. Neither claim-splitting nor claim-combining is permitted in federal habeas, however. As explained above, what matters in habeas is the claim as presented to, and adjudicated by, the state courts.

As presented in state court, this was a claim of ineffective assistance of counsel for failing to seek pre-trial severance based on the alleged inadmissibility and supposed Confrontation Clause violation of a co-conspirator statement in furtherance of the conspiracy that was uniformly found constitutional and admissible under that state hearsay exception over counsel's objection and motion in limine to exclude it as inadmissible. Any other portions of this conglomerated claim were never presented to the state courts. Those are procedurally defaulted without excuse and therefore unreviewable in habeas.[15]

_____

[15] Before a state prisoner may obtain federal habeas review of his conviction, he must first exhaust the remedies available in the state courts. 28 U.S.C. § 2254(b) (1) (A); Anderson v. Harless, 459 U.S. 4 (1982). The exhaustion rule requires the petitioner to have fairly presented the same claim – with the same facts and the same legal theory -- at all levels of the state judicial system, including the state's highest court, before presenting it in federal habeas. O'Sullivan v. Boerckel, 526 U.S. 838 (1999) (state prisoner must present same habeas claim to state court first); Doctor v. Walters, 96 F.3d 675, 678 (3d Cir. 1996) ("petitioner's state court pleadings and briefs must demonstrate that he has presented the legal theory and supporting facts asserted in the federal habeas petition in such a manner that the claims raised in the state courts are 'substantially equivalent' to those asserted in the federal court"); Landano v. Rafferty, 897 F.2d 661, 669 (3d Cir. 1990) ("substantial equivalence ... mean[s] that both the legal theory and the facts on which a federal claim rests must have been presented to the state courts"). See also Breard v. Pruett, 134 F.3d 615 (4th Cir. 1998) (exhaustion not

(footnote continued on next page)

A.  **Background:  pretrial motion in limine, trial testimony, and cautionary instructions**

The legal basis for the admission of the co-conspirator statement, and its non-violation of the Confrontation Clause, was apparent early on.  Since federal habeas review under AEDPA scrutinizes the reasonableness of the state courts' resolution of such a claim, it is important to review carefully just how this claim was presented and resolved from the start, before trial.

Because petitioner cites Bruton, it may also be useful preliminarily to observe that

---

satisfied if prisoner presents new legal theories or factual claims on habeas review).

If a petitioner has not "fairly presented" his or her claim to the state courts, but no state review remains available, the non-exhausted claim may be deemed technically "exhausted," even if the state courts have not had the opportunity to pass upon its merits.  Gray v. Netherland, 518 U.S. 152 (1996).  In that event, federal review is precluded if the "prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule."  Coleman v. Thompson, 501 U.S. 722, 749 (1991); see also O'Sullivan, 526 U.S. at 847-49 (claims not presented are defaulted where deadline for filing petition in state court has expired).  Here, it would be too late to file a new PCRA petition, and the PCRA's jurisdictional one-year statute of limitations is an adequate and independent state ground precluding federal habeas review.  See Whitney v. Horn, 280 F.3d 240, 251 (3d Cir. 2002) ("It is now clear that this one-year limitation is a jurisdictional rule that precludes consideration of the merits of any untimely PCRA petition, and it is strictly enforced in all cases, including death penalty appeals.").

"The adequacy of a state ground, of course, does not depend on an appellate decision applying general rules to the precise facts of the case at bar."  Lee v. Kemna, 534 U.S. 362, 382 n.13 (2002). There is no necessity for the state court to actually apply a settled procedural bar to a particular habeas claim before a federal court may determine that no state remedy exists.  E.g., Coleman v. Thompson, 501 U.S. 722, 735 n.1 ("if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement ***would now find*** the claims procedurally barred...there is procedural default") (emphasis added); Teague v. Lane, 489 U.S. 288, 299 (1989) (federal court may find claim procedurally defaulted notwithstanding state court's failure to invoke procedural rule, where claim was not presented to state court).  "[W]hen it is obvious that the unexhausted claims would be procedurally barred in state court due to a state-law procedural default, we can forego the needless 'judicial ping-pong' and just treat those claims now barred by state law as no basis for federal habeas relief."  Snowden v. Singletary, 135 F.3d 732, 736 (11th Cir.1998).  See also, e.g., O'Sullivan, supra; Lines v. Larkins, 208 F.3d 153, 162-66 (3d Cir.  2000). A federal court should thus dismiss a claim as procedurally defaulted if the claim has not been exhausted and state law would unambiguously bar it from being exhausted now. Carter v. Vaughn, 62 F.3d 591, 595 (3d Cir. 1995).  That is so as to all aspects of this issue apart from the allegation that, as presented in state court, trial counsel was ineffective for not moving to sever.

petitioner has never contended that any statement could or should have been redacted, and no statement at this trial was.

As reviewed above in the procedural history section, petitioner's attorney, Jules Epstein, Esquire, made a pre-trial oral motion in limine to bar Monique Lee's expected testimony that, a few minutes after the murder, she overheard co-defendant and co-conspirator McKenzie say to petitioner, "I told you not to shoot him."  N.T. 12/20/00, 28-34.  Counsel's basis for this motion was that the statement purportedly did not qualify under Pennsylvania's co-conspirator hearsay exception because:  (a) if there was any conspiracy, it was solely to shoot; (b) thus, the conspiracy had ended by the time of the statement, which was during flight; and (c) even if the conspiracy was to both shoot and flee, although the statement then might be during the conspiracy, it was not "in furtherance of" it, as required by that hearsay exception.  Id. at 30. Pennsylvania Rule of Evidence 803(25)(E) (the co-conspirator hearsay exception) and the case of Commonwealth v. Cull, 656 A.2d 476 (Pa. 1995), dealing with that exception were then discussed and analyzed in some detail, albeit in shorthand, as all present understood the state law then being examined.  N.T. 12/20/00 at 31-34.[16]

_____

[16] In Cull, applying what was then the state evidentiary common law version of that exception (later and by the time of this trial, designated Pa.R.E. 803(25)(E)), the Supreme Court of Pennsylvania found that the admission of two witnesses' testimony about the statements to them of a non-testifying co-defendant/co-conspirator which inculpated Cull in the murder, did not violate the Confrontation Clause, and were admissible pursuant to the Pennsylvania co-conspirator exception to the hearsay rule, even though made after the murder.  The court initially found the statements did not violate the Confrontation Clause because they bore sufficient "indicia of reliability" under the plurality opinion in Dutton v. Evans, 400 U.S. 74, 89 (1970) (testimony of inmate about incriminating statement of co-conspirator admissible under Georgia co-conspirator hearsay exception did not violate Confrontation Clause; habeas relief denied).  The statements incriminating Cull were made spontaneously, and were against the penal interest of the declarant.  Cull at 479-481.  See also Ohio v. Roberts, 448 U.S. 56 (1980) (based on Dutton; later overruled by Crawford v. Washington, 541 U.S. 36 (2004)).  The Cull court found the statements were admissible under the co-conspirator exception, as they were made during the conspiracy, "in furtherance of" it, and there was other evi-

(footnote continued on next page)

The court, Judge Greenspan, was still concerned with attorney Epstein's argument that the statement was made several minutes after the murder, and thus the conspiracy had ceased to be.  The court requested that the attorneys find further case law during the lunch break, if possible.  Following the break, the court reviewed Commonwealth v. Gooding, 649 A.2d 722 (Pa. Super. 1994) (co-conspirator statement thanking defendant for watching his back, made during flight from crime, admissible and found to be in furtherance of the conspiracy).  N.T. 12/20/00, 45-47.  After further discussion, the court denied petitioner's motion in limine, finding that the statement was made in furtherance of the conspiracy even though after the murder, and was admissible against McKenzie, though petitioner's silence in response was not admissible against him.  The court requested that the parties craft, and during trial the court repeatedly gave to the jury, a cautionary instruction that the evidence was only to be used against McKenzie, and not against petitioner in any way.  Id. at 47-50.

Just before Monique Lee's testimony, petitioner's trial counsel voiced a standing objection to the "I told you not to shoot" testimony, reiterating his belief that a cautionary instruction was insufficient, stating that this was "like Bruton" in that jury instructions would be insufficient; this was a "Bruton-type objection that it shouldn't come in.  It should be severed…." However, as ordered, he had crafted a jury instruction for the court to give.  N.T. 12/21/00, 2.

Immediately after Monique Lee's testimony, reviewed above, that she thought she heard McKenzie say, "I told you not to shoot him," per her police statement, the court provided its *first*

---

dence of the conspiracy – even though made after the murder, since they were "so closely connect-ed" to the criminal conduct that they might "reasonably be considered part of a continuing course of criminal conduct emanating from the substantive offense."  Cull, 656 A.2d at 482.  It was this "con-tinuing course" to which the attorneys and judge in the case at hand were referring.  Further, the Cull court held, trial counsel was not ineffective for failing to object to that testimony, since there was no Strickland prejudice. Id. at 482-83.

cautionary instruction to the jury that it could only take this as evidence against McKenzie and could not consider it evidence against petitioner Hill.  Id. at 41.  The court stated:

> Jurors, first of all, let me advise you that as to what she thinks he said, you can take that for what it is worth, that is number one; number two, anything she says that Mr. McKenzie said, you can only, only take as evidence as to Mr. McKenzie. You cannot take it as evidence as to Mr. Hill, only what Mr. McKenzie said can be taken as to Mr. McKenzie. It can't be taken as to Mr. Hill or anyone else. It can only be taken as to Mr. McKenzie and as to what Mr. McKenzie said, you may consider it only as to deciding Mr. McKenzie's state of mind and whether he was criminally involved. It is not any evidence any which way as to Mr. Hill.
> In short, if you find that Mr. McKenzie said these words after the shooting, then, again, it is evidence only as to Mr. McKenzie's case. It is not any evidence as to Mr. Hill's case and when you deliberate on Mr. Hill's case, that statement may not be considered in any way as evidence against Mr. Hill.

N.T. 12/21/00, 41-42.

Later, during re-cross examination by McKenzie's lawyer, it was revealed that in her police statement, Lee also conveyed that McKenzie refused to drive petitioner from the Walgreen's back home to the Richard Allen Homes, though he had agreed to bring him the red car.  The court interrupted and again, a **_second_** time, cautioned the jury:

> Jurors, I do want to remind [you], please, that anything that she testifies to as being said by Mr. McKenzie [--] be it before the shooting, after the shooting, any time [--] is only evidence as to Mr. McKenzie. It cannot in any way, shape or form be used as evidence as to Mr. Hill; do you understand that?
> (Whereupon, the jury panel collectively answer in the affirmative, at this time.)

N.T. 12/21/00, 79.

After both sides rested, the court gave preliminary instructions regarding closing arguments, id. at 33-35, and counsel presented those closing arguments, id. at 35-107.  The court's instructions to the jury followed.  Id. at 108-131.  Included as part of closing instructions was a **_third_** iteration of the cautionary instruction regarding Monique Lee's testimony about what McKenzie said to petitioner:

> You have heard evidence that Miss Lee claims that she heard a defendant, Mr. McKenzie, say something after the shooting.  That evidence may be used by you in only one way, in deciding the guilt or innocence of Mr. McKenzie or any of Mr. McKenzie's statements that were testified to.  You may consider it in deciding Mr. McKenzie's state of mind and in deciding whether he was criminally involved.  This statement, allegedly made by Mr. McKenzie, is not evidence in Mr. Hill's case; in short, if you find that Mr. McKenzie said those words after the shooting, it is evidence only in Mr. McKenzie's case.  When you deliberate on Mr. Hill's's [sic] case, however, that statement may not be considered in any way as evidence against Mr. Hill.

N.T. 12/22/00, 117-118.

### B.      State-court presentation of claim

Immediately after sentencing, petitioner's trial counsel orally sought to withdraw and, after filing post-sentence motions, be replaced by newly appointed counsel.  He said petitioner had voiced his dissatisfaction with him, complaining that he should have filed a pretrial severance motion based on Monique Lee's anticipated testimony about McKenzie saying, "I told you not to shoot him."  Although recognizing that the issue had already been articulated and preserved by counsel's pretrial motion in limine, during which severance was in fact discussed (as it was immediately before Lee's testimony), the court agreed to permit counsel's withdrawal and appoint new counsel under this procedure.  N.T. 12/22/00, 146-150.

In his written post-sentence motions, trial counsel asserted:  "The trial court erred in ruling that Monique Lee could testify to a statement made post-crime by codefendant Antonio McKenzie, as that statement was made after the conspiracy terminated and was not in furtherance thereof.  Admission of this statement deprived petitioner of this right to confront adverse witnesses as guaranteed by the United States and Pennsylvania Constitutions.  The limiting instruction given by the Court did not adequately protect petitioner from the harm of this statement, the declarant of which could not be cross-examined."  Exhibit E, Post-Sentence

Motions, ¶2.

On direct appeal, as predicted, petitioner claimed, inter alia, that trial counsel Epstein had

been ineffective for failing to move for severance before trial based on that expected testimony.

The trial court, Judge Greenspan, found this issue lacked merit in her opinion, providing the

following analysis:

> In order for a defendant to prevail on a claim of ineffective assistance of
> counsel, the defendant must demonstrate that he was prejudiced by trial counsel's
> performance. The defendant has not met this part of the tripartite test. The defend-
> ant was not prejudiced by trial counsel's failure to request a pre-trial severance
> because the statement made by co-defendant "Tone" would have come in as a co-
> conspirator statement even if defendant had been tried separately. Moreover, there
> was ample evidence, aside from the statement, of defendant's guilt.
>
> Co-conspirator statements are allowed "if they were made during the con-
> spiracy, in furtherance thereof, and where there is other evidence of the conspira-
> cy." Commonwealth v. Gooding, 437 Pa. Super. 193, 203, 649 A2d 722, 727
> (1994).  The Pennsylvania Supreme Court has held that there may be times when
> statements made after the crime are admissible because they are so closely con-
> nected to the commission of the actual crime that they may be considered as part
> of a continuing course of criminal conduct stemming from the actual crime.
> Commonwealth v. Cull, 540 Pa. 161, 173, 656 A2d 476, 482 (1995).  This state-
> ment was part of the continuing course of criminal conduct which went to the
> heart of the plan to confront Mr. Turner.
>
> Finally, even if McKenzie's statement to defendant was not admissible as
> a conspiratorial statement, the error was harmless beyond doubt because of the
> overwhelming evidence, independent of the statement, of defendant's guilt.
> Among the witnesses who testified, Monique Lee and Roslyn Johnson placed the
> defendant at the scene of the crime.  Ms. Johnson, who knew defendant, also testi-
> fied that she witnessed the defendant standing in the middle of Courtland Street in
> plain view running and shooting at the victim's car.  The physical evidence shows
> several bullet holes in the victim's vehicle - the rear window, the rear driver's side
> and the trunk.
>
> Indeed the statement "I told you not to shoot him" could be interpreted to
> lessen defendant's degree of guilt as it evidences that the plan did not incorporate
> an intent to kill.  Hence, given the overwhelming evidence of defendant's guilt,
> defendant was not prejudiced by the introduction of this statement -- about which
> the jury was specifically instructed to apply it to Mr. McKenzie only -- and de-
> fendant was not denied effective assistance of counsel.

38

Trial court opinion, appended to Exhibit F, at 6-7.

In the Superior Court, petitioner pressed this ineffectiveness claim, citing <u>United States v</u> <u>Belle</u>, 593 F.2d 487, 494-496 (3d Cir. 1979), and <u>Commonwealth v. Gribble</u>, 703 A.2d 426, 436 (Pa. 1997), both <u>Bruton</u> cases.  Appendix at 182-195.  Citing <u>Commonwealth v. Williams</u>, 720 A.2d 679 (Pa. 1998), the Superior Court initially acknowledged that, "in order to succeed [on a pretrial severance motion,] his counsel would have to show that the defenses were antagonistic to the point where individual differences were irreconcilable and a joint trial would have resulted in prejudice."  Superior Court opinion (appended to Exhibit F) at 4.  The Superior Court found that this statement, which co-defendant McKenzie had insisted should be in or severance should be granted, did not rise to that requisite level of prejudice under state law.

However, it found, even if severance had been granted, the statement still would have been admitted at petitioner's trial as a co-conspirator statement, under the continuing course analysis of <u>Cull</u>.  <u>Id.</u> at 5, citing <u>Cull</u>, 656 A.2d at 480-82.  Observing that the trial judge did give a cautionary instruction, the Superior Court found there was no showing of prejudice, and thus no <u>Strickland</u> ineffectiveness, here.  Superior Court opinion at 5-6.


**C.      The state courts neither contradicted nor unreasonably applied <u>Strickland</u>.**

In so finding, the state courts acted reasonably and neither contradicted nor unreasonably applied United States Supreme Court precedent.  Thus, under AEDPA, habeas relief must be denied -- even if somehow this petition were deemed timely, which it should not be.  Moreover, even if there had been an unreasonable application or contradiction of United States Supreme Court precedent under AEDPA, there was still no constitutional violation under 28 U.S.C. § 2254(a), as required.  Counsel was not ineffective, because there was in fact no <u>Strickland</u>

prejudice.

### i.      Standard of review of state-denied ineffectiveness claim

The "clearly established federal law" to be examined under 28 U.S.C. § 2254(d)(1) for ineffective assistance of counsel claims is <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). <u>Williams v. Taylor</u>, 529 U.S. 362 (2000).  Under <u>Strickland</u>, a petitioner claiming ineffective assistance of counsel must overcome the strong presumption that counsel was effective.  The petitioner must provide evidence that (1) counsel performed deficiently; and (2) as a result of that deficient performance, the defendant was prejudiced.  <u>Strickland</u>, 466 U.S. at 687; <u>Outten v. Kearney</u>, 464 F.3d 401, 414 (3d Cir. 2006).

To prevail in showing the first required prong, unreasonable performance, a petitioner must "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" <u>Strickland</u> at 689, <u>quoting</u> <u>Michel v. Louisiana</u>, 350 U.S. 91, 101 (1955). To do so, a petitioner must prove counsel's conduct was so unreasonable that no competent lawyer would have followed it under the prevailing law at that time, and counsel "made errors so serious that counsel was not functioning as 'counsel' guaranteed ... by the Sixth Amendment." <u>Strickland</u>, 466 U.S. at 687.

It is "all too tempting" for a petitioner to second-guess counsel after the fact and "all too easy" for a court to deem a particular act or omission unreasonable merely because counsel's overall strategy did not achieve the result his client hoped for. <u>Id.</u>; <u>see</u> also <u>Yarborough v. Gentry</u>, 540 U.S. 1, 8 (2003) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight"); <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 372 (1993) (<u>Strickland</u> adopted "the rule of contemporary assessment" because it recognized "from the

perspective of hindsight there is a natural tendency to speculate as to whether a different trial strategy might have been more successful").

Strickland therefore imposes a "highly demanding" standard upon a petitioner to prove the "gross incompetence" of his counsel. Kimmelman v. Morrison, 477 U.S. 365, 382 (1986). It is only the "rare claim" of ineffective assistance of counsel that should succeed. Buehl v. Vaughn, 166 F.3d 163, 169 (3d Cir. 1999) ("Because counsel is afforded a wide range within which to make decisions without fear of judicial second-guessing, we have cautioned that it is 'only the rare claim of ineffectiveness that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance.'"), quoting U.S. v. Gray, 878 F.2d 702, 711 (3d Cir. 1989).

"[A] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight … and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.  The inquiry must determine whether the petitioner received a fair trial, not whether counsel was prudent, appropriate, or perfect. Marshall v. Hendricks, 307 F.3d 36, 91 (3d Cir. 2002).

Even if counsel's conduct is found deficient, he will not be deemed ineffective unless there is a sufficient showing of the second required Strickland prong, i.e., that counsel's conduct prejudiced his or her client.  Strickland, 466 U.S. at 692; Outten, 464 F.3d at 414.  To show prejudice, the petitioner must demonstrate "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; accord Outten, 464 F.3d at 414.

It does not matter which prong a court evaluates first; failure to show either defeats the

claim.  Strickland, 466 U.S. at 697.  That is, unlike with many other sorts of claims, under

Strickland, prejudice is a component and requisite showing.  Without it, there is no

ineffectiveness.

It is only the rare case that succeeds under this very deferential standard.  United States v.

Kauffman, 109 F.3d 186, 190 (3d Cir. 1997).

To succeed on a claim of ineffective assistance of counsel on AEDPA habeas review, a

petitioner must show that the state court's application of Strickland was objectively unreasonable,

which is also a deferential standard.  Woodford v. Visciotti, 537 U.S. 19, 25 (2002).  Thus,

review of an ineffectiveness claim is "doubly deferential when it is conducted through the lens of

federal habeas."  Yarborough v. Gentry, 540 U.S. 1, 6 (2003).  "When § 2254(d) applies, the

question is not whether counsel's actions were reasonable.  The question is whether there is any

reasonable argument that counsel satisfied Strickland's deferential standard."  Harrington v.

Richter, 131 S.Ct. 770, 788 (2011).  "A state court must be granted a deference and latitude that

are not in operation when the case involves review under the Strickland standard itself."  Id., at

785.

Courts cannot hold counsel ineffective for failing to take an action that would have had

no basis, and counsel is never ineffective for failing to pursue a meritless claim. See Werts v.

Vaughn, 228 F.3d 178, 203 (3d Cir. 2000), cert. denied, 532 U.S. 980 (2001) (discussing

Commonwealth v. Carpenter, 725 A.2d 154, 161 (Pa. 1999)); U.S. v. Sanders, 165 F.3d 248, 253

(3d Cir. 1999) ("There can be no Sixth Amendment deprivation of effective counsel based on an

attorney's failure to raise a meritless argument."); U.S. v. Fulford, 825 F.2d 3, 9 (3d Cir. 1987)

(defendant not prejudiced by failing to pursue meritless issue). See also Bolender v. Singletary,

16 F.3d 1547, 1573 (11th Cir.), cert. denied, 531 U.S. 1022 (1994); Thomas v. U.S., 951 F.2d 902,

905 (8th Cir. 1991); U.S. v. Snyder, 787 F.2d 1429, 1432-33 (10th Cir.), cert. denied, 479 U.S. 836

(1986) (counsel should not file every possible motion but only those having a solid foundation);

accord U.S. v. Afflerbach, 754 F.2d 866 (10th Cir.), cert. denied, 472 U.S. 1029 (1985); Tiemens v.

U.S., 724 F.2d 928 (11th Cir.), cert. denied, 469 U.S. 837 (1984) (counsel under no obligation to

raise insubstantial claims); Murray v. Maggio, 736 F.2d 279 (5th Cir. 1984) (counsel not required

to file futile motions).  Thus, if the claim counsel is alleged to have failed to argue lacks merit,

that also shows that counsel was not ineffective.

In a federal habeas proceeding, where the claim underlying an ineffective assistance of

counsel allegation resides in state law, a state court ruling on that state law claim is binding.

Priester v. Vaughn, 382 F.3d 394, 402 (3d Cir. 2004) (prisoner cannot demonstrate counsel was

ineffective for failing to raise a state-law objection that the state courts deemed meritless), cert.

denied, 543 U.S. 1093 (2005). See Clark v. Groose, 16 F.3d 960, 964 (8th Cir. 1994) (holding

state court ruling on state claim which formed basis of ineffective assistance of counsel claim

was binding in federal habeas). In the interest of comity, a reviewing federal habeas court must

respect a state court's interpretation of state law. See also Estelle v. McGuire, 502 U.S. 62, 68

(1991) (explaining "it is not the province of a federal habeas court to reexamine state-court

determinations on state-law questions").

Because the focus of this Court's review under AEDPA is the state courts' treatment of

petitioner's claim, it is significant that under Pennsylvania law, the standards for the

ineffectiveness of counsel are identical to those under Strickland.  Rompilla v. Horn, 355 F.3d

233, 248 (3d Cir. 2004), overruled on other grounds, Rompilla v. Beard, 545 U.S. 374(2005).

Pennsylvania's test for assessing ineffective assistance of counsel claims is not contrary to

Strickland. Jacobs v. Horn, 395 F.3d 92, 107 n.9 (3d Cir. 2005); Werts v. Vaughn, 228 F.3d 178,

202-204 (3d Cir. 2000).  Thus, under § 2254(d)(1), the relevant inquiry in addressing an ineffectiveness claim that has been adjudicated on the merits, such as this one, is whether the Pennsylvania's Supreme Court's decision involved an unreasonable application of <u>Strickland</u>. <u>Jacobs</u>, 395 F.3d at 107 n.9; <u>Werts</u>, 228 F.3d at 204.

> ### ii.      The state courts acted reasonably.

The state courts acted reasonably in finding the required <u>Strickland</u> prejudice element was unfulfilled.

As reviewed in detail above and found by the state courts, the evidence against petitioner was overwhelming.  It included the eyewitness testimony and police statements of Monique Lee, Sharon Millsaps, and Damien Peurifoy, as well as the ballistics evidence in both the body of the victim and the car that showed the bullet was fired from exactly where all witnesses said petitioner was standing, and not from where his co-defendant, McKenzie, was standing.

Even had counsel moved for severance, the statement would have come in, because it is admissible under the state co-conspirator hearsay exception and does not violate the Confrontation Clause, as the state courts found.  And even if it had not been admitted somehow, the verdict would plainly have been the same.

There is no reasonable probability of a different outcome, as the state courts rightly found. That means the <u>Strickland</u> claim lacked merit, as the state courts found.  Since that was a reasonable application of <u>Strickland</u>, habeas relief must be denied.

> ### D.      The claim also lacks merit because there was no underlying Confrontation Clause violation, so trial counsel's performance was reasonable.

Even had the state courts acted unreasonably under AEDPA or, worse, even erred in the

prejudice analysis, however, the denial of this claim by the state courts would still have been

both reasonable and correct.  Counsel's performance in not seeking severance before trial was

reasonable, i.e., the other <u>Strickland</u> prong, because this evidence was clearly admissible, and

because a severance motion would plainly have been denied.  Counsel is never ineffective for

failing to pursue a meritless strategy.  The state courts' denial of the ineffectiveness claim was

reasonable on that alternative ground as well.

 The claim underlying the <u>Strickland</u> ineffectiveness contention -- that the Confrontation

Clause was violated by the admission of an admissible non-testimonial co-conspirator statement

that inculpated the defendant, and that, in addition to making his oral motion in limine, voicing

his standing objection, and calling for severance immediately before Monique Lee testified, trial

counsel should have sought severance before trial -- lacks merit.


### i.      Law before <u>Crawford v. Washington</u>, 541 U.S. 36 (2004)

 Under the law that applied at the time of counsel's decision at trial, as well as at the time

of the state-court adjudication finding counsel was not ineffective, the admission of a co-

conspirator's statement made in furtherance of the conspiracy did not violate the Confrontation

Clause or <u>Bruton</u>, as the United States Supreme Court explained in <u>Dutton</u>, 400 U.S. 74, 87.  <u>See</u>

<u>United States v. Ayarza-Garcia</u>, 819 F.2d 1043, 1049 (11th Cir. 1987) (same).  <u>Dutton</u> was cited

and discussed in the state-court opinion in <u>Commonwealth v. Cull</u>, and <u>Cull</u> was cited, discussed,

and applied correctly by the trial court and counsel during the pretrial motion here.

 Severance is not required in such a situation, either.  In <u>Richardson v. Marsh</u>, 481 U.S.

200 (1987), the Supreme Court, noting the many benefits that flow from a system favoring joint

trial of co-defendants, refused to adopt a rule requiring severance whenever a co-defendant has

confessed to the crimes.  Whether to sever cases of co-defendants is instead a decision vested in the sound discretion of the trial court.  See United States v. Lane, 474 U.S. 438, n.8 (1986) (improper joinder does not in itself violated the constitution); Demps v. Wainwright, 666 F.2d 224 (5th Cir. 1982); Jenkins v. Bordenkircher, 611 F.2d 162 (6th Cir. 1979).  And under federal law, as under state, to sustain a claim that the antagonistic defense of a co-conspirator deprived the defendant of a fair trial, the defenses must have conflicted to the point of being irreconcilable and mutually exclusive.  United States v. Provenzano, 688 F.2d 194 (3d Cir. 1982).  There was no such conflict here, as the state courts rightly found.  Thus, the state courts' severance decision did not violate federal law, either.

The reasonableness of the performance of counsel is, as explained above, viewed under the law that prevailed at the time of counsel's decision or omission.  At the time, as discussed in Cull, and by both sides' counsel and the trial court during the pretrial motion in limine proceeding, the governing law regarding the Confrontation Clause looked to whether the unavailable co-conspirator's statement bore sufficient indicia of reliability, per Cull and Dutton (and Ohio v. Roberts, 448 U.S. 56 (1980), itself based in part on Dutton).  The court here found there were such indicia:  the statement was spontaneous and against McKenzie's penal interest, exposing him to conspiratorial liability by admitting discussing the use of a gun before the shooting.  Thus, counsel's performance in not seeking severance was reasonable.

In this regard, the state courts' denial of the ineffectiveness claim was fully in accord with, and neither contradicted nor unreasonably applied, the law in place at the time of trial or during direct appeal, the law that applies in federal habeas when analyzing the reasonableness of the state courts' application of the holdings of the United States Supreme Court under AEDPA – not only under Strickland, which prohibits applying new law retrospectively to counsel's

performance, but also under AEDPA, which considers the reasonableness of the state-court

decision at that time the state courts rendered their decision and denied this <u>Strickland</u> claim.

<u>Greene v. Fisher</u>, 132 S.Ct. 38, 44 (2011).  "[C]learly established [f]ederal law" within the

meaning of 28 U.S.C. § 2254(d)(1) encompasses Supreme Court decisions that "were announced

at the time of the last state court merits adjudication." Brian R. Means, Postconviction Remedies

§ 29:29 (2016).  <u>See</u>, <u>e.g.</u>, <u>Lambert v. Beard</u>, No. CIV.A.02-9034, 2007 WL 2173390, at *13 n.20

(claim 6) (E.D. Pa. July 24, 2007) (Baylson, J.), vacated in part on other grounds, 626 F.3d 186

(3d Cir. 2010), and vacated on other grounds, 633 F.3d 126 (3d Cir. 2011), cert. granted,

judgment vacated sub nom. <u>Wetzel v. Lambert</u>, 565 U.S. 520 (2012), and vacated on other

grounds, 537 Fed. Appx. 78 (3d Cir. 2013) (<u>Crawford v. Washington</u>, 541 U.S. 36 (2004) does

not apply to analysis of reasonableness, under AEDPA, of state decision already final on direct

appeal when <u>Crawford</u> decided).[17]

Petitioner's case became final on direct appeal in 2002, two years before <u>Crawford</u> was

decided in 2004.  Under the then-applicable pre-<u>Crawford</u> analysis, the right to confront

witnesses does not preclude the admission of hearsay evidence, so long as its reliability has been

established by demonstrating that it (1) "falls within a firmly rooted hearsay exception" or (2)

contains "particularized guarantees of trustworthiness" such that adversarial testing would be

expected to add little, if anything, to the statements' reliability. <u>Ohio v. Roberts</u>, 448 U.S. at 66.

---

[17] The court there also observed:

> The admission of co-conspirator statements has long been allowed in both state
> and federal courts, and is part of the Federal Rules of Evidence. See Fed.R.Evid.
> 801(d)(2)(E) (co-conspirator statements made "during the course and in further-
> ance of the conspiracy" are not hearsay). It is well-established that statements
> made by co-conspirators in a getaway car promptly after a crime are made in fur-
> therance of the conspiracy, and therefore are admissible against other conspirators.

2007 WL 2173390, at *14.

Here, the statement was admissible against petitioner pursuant to the co-conspirator exception to

the hearsay rule. Admission of testimony pursuant to that "firmly rooted hearsay exception"

satisfies the requirements of the Confrontation Clause. See Bourjaily v. United States, 483 U.S.

171, 182-84 (1987) (admission of non-testifying co-conspirator's statement against defendant

does not offend Confrontation Clause as long as it satisfies the co-conspirator exception of Fed.

R. E. 801(d)(2)(E), since requirements of co-conspirator exception are "identical" to those of

Confrontation Clause); United States v. Cruz, 910 F.2d 1072, 1083 (3d Cir. 1990) (same).  See

also United States v. Holman, 27 Fed. Appx. 210, 212 (4th Cir. 2001) ("The Supreme Court has

recognized that Bruton is inapplicable where the statement is admissible pursuant to a 'firmly

rooted hearsay exception.' Lilly v. Virginia, 527 U.S. 116, 124 (1999). This Circuit has held that

Federal Rule of Evidence 801(d)(2)(E) is such a firmly rooted hearsay exception. See United

States v. Shores, 33 F.3d 438, 442 (4th Cir. 1994).").

Since the state courts did not unreasonably apply Ohio v. Roberts in analyzing the

Confrontation Clause, the standards of AEDPA are not met here – and, moreover, the issue

underlying the ineffectiveness claim, i.e., an alleged Confrontation Clause violation, lacks merit.


**ii.    Post-Crawford law**

But even if it were somehow shown that the state courts acted unreasonably under

AEDPA/Strickland, Strickland, or even erred under Ohio v. Roberts, that would still not be

enough, as explained in the standards of review section above.  An actual violation of the ***current***

law regarding the Confrontation Clause – the claim underlying the ineffectiveness accusation

against Jules Epstein – still must be shown under 28 U.S.C. § 2254(a).

As explained in United States v. Berrios, 676 F.3d 118, 125 (3d Cir. 2012), the Supreme

Court in Crawford, 541 U.S. 36, overruled Roberts and its line entirely, "holding without qualification that the Confrontation Clause protects the defendant *only* against the introduction of testimonial hearsay statements, and that admissibility of nontestimonial hearsay is governed solely by the rules of evidence." Berrios, 676 at 126 (italics in original).  See Davis v. Washington, 547 U.S. 813, 823-26 (2006) (clarifying that the statements from one prisoner to another in Dutton v. Evans, 400 U.S. at 87-89, were clearly nontestimonial, and reiterating, per Crawford, that Confrontation Clause no longer applies to such nontestimonial statements). Although this change may not be relevant in evaluating the performance of counsel at the time under Strickland, or the reasonableness under AEDPA of the state-court finding that counsel was not ineffective under the prevailing law at the time, it is relevant to the habeas analysis and precludes relief under § 2254(a).

   A violation of the current standards cannot be shown here, and that dooms petitioner's claim, regardless of the status of the AEDPA/Strickland Roberts analysis.  Cf. Desai v. Booker, 538 F.3d 424, 427 (6th Cir. 2008) (Sutton, J.) ("May a habeas applicant obtain relief on the basis of a state court's allegedly unreasonable application of a Supreme Court precedent (Roberts) that no longer is good law (see Crawford/Davis)? No, we conclude, for several reasons. . . ."); Delgadillo v. Woodford, 527 F.3d 919, 927-28 (9th Cir. 2008) (explaining that because only states, rather than petitioners, have a legitimate interest in the nonretroactivity of new rules of criminal procedure, the petitioner "could not have required a federal habeas court to apply [the now-overruled] Ohio v. Roberts to his Confrontation Clause claims over the state's objection"); Jackson v. McKee, 525 F.3d 430, 438 (6th Cir. 2008) (Sutton, J.) ("Jackson, at any rate, loses either way. Under today's precedent, Jackson loses because Davis makes clear that the Confrontation Clause does not prevent the admission of non-testimonial hearsay. Under

yesterday's precedent, Jackson loses because the state court reasonably applied the <u>Roberts</u>

test."). <u>Desai</u>, <u>Delgadillo</u>, and <u>Jackson</u> make clear:  petitioner's claim cannot possibly support

habeas relief.

Monique Lee's testimony that she heard co-defendant Antonio McKenzie tell petitioner

that "I told you not to shoot him," does ***not*** constitute a testimonial statement.  See <u>Michigan v.</u>

<u>Bryant</u>, 131 S.Ct. 1143, 1157, n.9 (2011) ("Statements to friends and neighbors" are not

testimonial and would be excluded, if at all, only by state hearsay rules, not the Confrontation

Clause); <u>Davis v. Washington</u>, 547 U.S. 813 (victim's 911 call identifying defendant not

testimonial); <u>Crawford</u>, 541 U.S. at 51 (Confrontation Clause only concerned with testimonial

hearsay; "[a]n accuser who makes a formal statement to government officers bears testimony in a

sense that a person who makes a casual remark to an acquaintance does not."); <u>Berrios</u>, 676 F.3d

at 127 (court must first determine if statement is testimonial; it if is not testimonial, admissibility

is governed solely by the rules of evidence, and <u>Bruton</u> does not apply).  See <u>also</u> <u>Waller v.</u>

<u>Varano</u>, 562 Fed. Appx. 91, 94-95 (3d Cir. 2014) (not precedential) (statement to a cousin stating

he had recently been involved in a crime was not testimonial, so claim that counsel was

ineffective for allowing <u>Bruton</u> violation has no merit); <u>Reddick v. Warren</u>, No. CV 12-7875

(SDW), 2016 WL 29261, at *11-12 (D.N.J. Jan. 4, 2016), certificate of appealability denied

(May 25, 2016) (because statement non-testimonial, admissibility controlled entirely by state

rules of evidence).  In sum:

> [T]he Third Circuit has since interpreted <u>Crawford</u> and its progeny to provide that
> "where nontestimonial hearsay is concerned, the Confrontation Clause has no role
> to play in determining the admissibility of a declarant's statement." <u>United States</u>
> <u>v. Berrios</u>, 676 F.3d 118, 126 (3d Cir. 2012).  The Third Circuit determined that
> "[a]ny protection provided by <u>Bruton</u> is therefore only afforded to the same extent
> as the Confrontation Clause, which requires that the challenged statement qualify
> as testimonial." <u>Id.</u> at 128. " 'Testimonial' statements under the Confrontation
> Clause are those made by 'witnesses' who 'bear testimony,' such as by making a

'formal statement to government officers,' and are not statements made casually to acquaintances." <u>Waller v. Varano</u>, 562 Fed. Appx. 91, 94 (3d Cir. 2014) (citations omitted).

<u>Mitchell v. Walsh</u>, No. 1:09-CV-02548, 2017 WL 3725503, at *6 (M.D. Pa. Aug. 29, 2017),

<u>appeal</u> <u>pending</u> <u>sub</u> <u>nom.</u> <u>Mitchell v. Superintendent</u>, 17-3118 (3d Cir.).

Thus, <u>Bruton</u> does not apply to this non-testimonial statement, and petitioner's

underlying claim is meritless.

Unlike in a situation where <u>Bruton</u> does apply, here, the jury is presumed to have

followed the strong and repeated cautionary instructions of the trial judge, as the state courts

found – and that, too, is fully in accord with federal law.  <u>Lockhart v. McCree</u>, 476 U.S. 162

(1986) (our legal system rests on the premise that a jury will follow the court's instructions and

reach its decision based on an application of the law to the facts).

Petitioner relies primarily upon <u>Eley v. Erickson</u>, 712 F.3d 837 (3d Cir. 2013).

Memorandum at 26.  However, since that is not a case of the United States Supreme Court, and

thus does not constitute clearly established federal law for purposes of the habeas statute, it

cannot possibly lead to habeas relief under the AEDPA standards.  In any event, it did not

implicate any of the law or analysis set forth above.  Moreover, <u>Eley</u> did not examine <u>Crawford</u>,

as the Third Circuit itself has explicitly recognized.  <u>See</u> <u>Waller v. Varano</u>, 562 Fed. Appx. 91, 95

n.5 (3d Cir. 2014) (not precedential) ("the parties in <u>Eley</u> did not mention, and the <u>Eley</u> Court did

not consider or rule on, the <u>Crawford</u> issue."). <u>See</u> <u>also</u> <u>Mitchell v. Walsh</u>, 2016 WL 9548858,

*20 (M.D. Pa., Dec. 12, 2016), Report and Recommendation adopted, COA issued, No. 1:09-

CV-02548, 2017 WL 3725503 (M.D. Pa. Aug. 29, 2017), <u>Mitchell v. Superintendent</u>, 17-3118

(3d Cir.) (appeal pending) ("the Third Circuit in <u>Eley</u> did not address the <u>Crawford</u> issue.").

Thus, <u>Eley</u> did not even consider whether a casual statement between friends or relatives

in an informal setting of the sort at issue here could be considered "testimonial" for purposes of Crawford, much less hold that such statements are in fact subject to the Sixth Amendment.  Eley hardly dictates that McKenzie's offhand comment to his cousin on the street in the immediate aftermath of the murder constituted a testimonial statement covered by Bruton.

Because "I told you not to shoot him" is not a testimonial statement, Bruton does not apply.  Counsel was not ineffective because there was no Strickland prejudice; even had he moved for severance, it would not have been granted, and there would have been no effect on the verdict.  Even if the statement somehow had been kept out, that, too, would have had no effect on the verdict.  His performance was reasonable, since there was no Confrontation Clause violation, whether under Roberts or Crawford.  And even if a reviewing court could somehow find that a Bruton error occurred in this case, it too would be subject to harmless error analysis. Although there was none, any hypothetical error was harmless, having had no substantial and injurious effect on the outcome.

The ineffectiveness claim is meritless, and the petition is time-barred.

Habeas relief, and review, must be denied.

## <u>CONCLUSION</u>

**WHEREFORE**, respondents respectfully request that the Petition for Writ of Habeas Corpus be dismissed with prejudice and without a hearing as time-barred, or, in the alternative, be denied with prejudice and without a hearing as lacking in merit, and that the Court deny a Certificate of Appealability.

Respectfully submitted,

/s
JOHN W. GOLDSBOROUGH
Assistant District Attorney
MAX C. KAUFMAN
Interim Supervisor, Federal Litigation Unit

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

IVAN HILL : CIVIL ACTION

V. :

MIKE WENEROWICZ, et al. : NO. 14-4574


**CERTIFICATE OF SERVICE**


I, JOHN W. GOLDSBOROUGH, hereby certify that on January 12, 2018, a copy of the

foregoing pleading was served by this Court's ECF system upon:



Arianna J. Freeman, Assistant Federal Defender
Federal Community Defender Office for the E.D. of Pa.
601 Walnut St., Suite 540 W
Philadelphia, PA  19106



/s_____
JOHN W. GOLDSBOROUGH
Assistant District Attorney
District Attorney's Office
Three South Penn Square
Corner of Juniper and S. Penn Square
Philadelphia, PA 19107-3499
john.goldsborough@phila.gov